UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:                                                                    Bankruptcy No. 00-31724
                                                                          Chapter 7
Norman B. Erickson, III,

        Debtor.
_____/                                          Adversary No. 07-7005

Norman B. Erickson, III,

        Plaintiff,

vs.

Jeannine Faye Erickson,

        Defendant.
_____/

**MEMORANDUM AND ORDER**

      By Complaint filed March 19, 2007, Debtor/Plaintiff Norman B. Erickson, III, initiated this adversary proceeding seeking a ruling that: the discharge injunction extends to the debts Debtor was assigned in his divorce proceeding; Defendant be found in contempt for violating Debtor's discharge injunction; Defendant be prohibited from contacting Debtor regarding the debts assigned to him in their divorce proceedings; and Defendant must pay damages and attorney's fees and costs associated with this proceeding. Defendant filed her answer, denying Debtor's allegations, on April 13, 2007. The matter was tried on November 14, 2007. The following constitutes the Court's findings of fact and conclusions of law.

**Findings of Fact**

      Debtor/Plaintiff Norman Erickson and Defendant Jeannine Erickson were married in August 1983. In 1986, Debtor and Defendant moved back to their hometown, Fertile, Minnesota. At that time, Debtor began working in his family's business which was the operation

of a service station.  Sometime during the marriage Defendant began operating Encore, a second-hand consignment store which continues to operate today.

Citing irreconcilable differences, Debtor and Defendant separated in 1998 and were divorced in 1999.  At the time of the divorce, Debtor and Defendant were having financial difficulties.  The parties decided that Defendant would be responsible for the debt related to their residence as well as debt accumulated in the operation Encore, while Debtor would assume responsibility for the couples's debt associated with their lake home and his business operations.  Included in Debtor's responsibilities was a debt to U.S. Bank, which, at the time of the divorce, totaled $4,500.00.  This debt is the subject of the current litigation.

After the divorce, Debtor continued to have financial problems, with the family business being the root of them.  Due to new federal regulations and necessary building upgrades, Debtor was going to need to invest a large sum of money into the service station.  The market would not cash flow the loan payments, and although Debtor remained hopeful, the station continued to operate in the red and Debtor decided to file bankruptcy.

In anticipation of filing bankruptcy, Debtor met with attorney Brad Sinclair to discuss his options.  Both parties testified that Debtor asked Defendant to meet with him and Sinclair to discuss how his bankruptcy filing may affect her.  At this meeting, Sinclair told Defendant that she would be held responsible for any joint debts.  Defendant was advised that if she wanted to contest Debtor's discharge she would need to file an adversary proceeding in the bankruptcy case.  Defendant discussed this matter with her divorce attorney, Patti Jensen, and she was advised against commencing an adversary proceeding because in Jensen's opinion, the debts were so small that she did not think the creditors would seek payment from Defendant.

Debtor filed his Chapter 7 bankruptcy petition on November 20, 2000. In Schedule F, Debtor listed U.S. Bank, with a claim amount of $4,774.99, and Defendant as creditors holding unsecured, nonpriority claims. As discussed with her attorney, Defendant did not commence an adversary proceeding, and Debtor received his discharge on February 15, 2001.

According to Debtor, almost immediately after receiving his discharge he was contacted by Defendant regarding the discharged U.S. Bank debt. Debtor testified that in early 2001, probably March, he received a phone call from Defendant. She informed him that she was being pursued by creditors for debts that were deemed to be his responsibility in the divorce settlement and that she would like help paying off the debt. Debtor testified that he received one or two such calls per year until 2006. During each call, he explained to Defendant with increasing firmness that this debt had been discharged in his bankruptcy and he was not responsible for it.

In addition to the phone calls from Defendant, Debtor was also receiving letters from Defendant's attorney, Jensen. On May 31, 2006, Jensen sent a letter regarding the discharged debt to Carol Johnson, Debtor's divorce attorney. In this letter, Jensen provides Johnson with Debtor's new home address and asks that she speak to him about "issues of debt which are bothersome to Jeannie at this time." Exhibit No. 5. Jensen sent another letter to Johnson on June 6, 2002, and for the first time explicitly referenced the U.S. Bank debt. In it, Jensen states, "I am enclosing, once again, a letter of collection which Jeannie Erickson has received regarding a US Bank account. It is my recollection that this is an account which was Bernie's responsibility." Exhibit No. 6. Several letters were entered into evidence which read similarly. Additionally, Debtor testified that there were many letters like those mentioned above that he did not keep. He attempted to obtain these letters during the discovery phase of this litigation but

3

was unable to do so.  Finally, Debtor entered letters into evidence from Jensen to First Collections, the collection agency for U.S. Bank, which showed that Jensen attempted to get First Collections to pursue Debtor, even though she knew this debt was discharged in his bankruptcy.

At the end of his direct examination, Debtor was asked why he waited so long, approximately six years, to commence this action.  Debtor stated that each time he talked to Defendant he became more stern and believed that the conversation about the discahrged debt would be the last.  The last straw, however, occurred in November 2006.  At that time, Debtor, after suffering his second heart attack earlier that year and knowing his family's history of heart problems, had an internal defibrillator put in.  When he returned home from the hospital, Debtor found another letter from Jensen in his mail box.  In it, Jensen served Debtor with moving papers regarding the amount of child support that he owed.  In the last paragraph, Jensen advises Debtor that in the years since his divorce Defendant had been forced to payoff bills that were deemed to be his responsibility in their divorce proceeding.  Jensen closes the letter by stating, "Jeannie has advised that you have assured that you have taken the steps necessary to protect your children in the event of your death.  She only asks that you provide verification of that fact."  After receiving this letter, Debtor decided to consult with an attorney.

Defendant painted a very different picture of the events leading up to this lawsuit.  Defendant claims that Debtor was never subjected to any collection efforts and that the parties had a good relationship.  Defendant remembered meeting once with Sinclair to discuss Debtor's bankruptcy.  She recalled how stressed Debtor was and how she tried her best to listen and be there for him.  She told her attorney, Jensen, that she did not want to pursue Debtor for

repayment of the U.S. Bank debt. Defendant admitted that she spoke with Debtor about the U.S. Bank debt after his discharge but stated that she never demanded payment, she only expressed the fact that his creditors were now coming after her and that it was difficult. After receiving the collection letters, she would simply forward them to Jensen. She did not know what Jensen did with them until she was copied on the letters Jensen sent to Debtor. When Debtor mentioned the letters he was receiving from Jensen, Defendant told him that she never told Jensen to go after him for payment.

Defendant was adamant that the November 3, 2006, letter from Jensen to Debtor referencing the possibility of Debtor's death, was not intentional. Although Defendant had heard from her children that Debtor would be having surgery, she did not know the exact date and time of it. Defendant had spoken with Jensen about the surgery and informed her she was concerned for her kids and wanted to make sure that Debtor had his life insurance in order. The timing of the letter, according to Defendant, was merely a coincidence.

## Conclusions of Law

Section 524(a)(2) states that a discharge in a case "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor . . . ." 11 U.S.C. § 524(a)(2); Everly v. 4745 Second Avenue, Ltd. (In re Everly), 346 B.R. 791, 795 (B.A.P. 8th Cir. 2006). Section 524(a)(2) was enacted in order to continue the temporary stay imposed by section 362 when a case is first commenced. Waswick v. Stutsman County Bank (In re Waswick), 212 B.R. 350, 352 (Bankr. D.N.D. 1997). The purpose of the injunction is to ensure that once a debt is discharged the debtor will not be pressured in anyway to repay it. In re Everly, 346 B.R. at 795.

5

Willful violation of the injunction set forth in section 524(a)(2) will warrant a finding of civil contempt.  In re Waswick, 212 B.R. at 352.  In order to prove civil contempt, the moving party must show that the offender had knowledge of the discharge and willfully violated it by continuing with the actions complained of.  Id.  The burden of proof is by clear and convincing evidence.  Id.  The "clear and convincing" standard calls for proof beyond a mere "preponderance of the evidence" but is below the "reasonable doubt" standard used in criminal trials.  See    Alexander v. Warren, Ark. School. Dist. No. 1 Bd., 464 F.2d 471, 474 (8th Cir. 1972).  McCormick on Evidence defines "clear and convincing evidence" as evidence which makes it "highly probable" that the acts complained of occurred.  2 McCormick on Evid. § 340 (6th ed.)

     Debtor has proven that Defendant had knowledge of Debtor's bankruptcy discharge.  In reviewing the Court's records, Debtor's bankruptcy discharge was issued on February 15, 2001.  Notice of the discharge was sent to creditors on February 20, 2001.  Defendant was included in the list of creditors who were provided notice of the discharge, and notice was mailed to her at P.O. Box 621, Fertile, MN 56540, her current mailing address.  No evidence was put forth that she did not receive the discharge notice.  Even if she had not received the notice by mail, Debtor informed Defendant on several occasions that he had received a bankruptcy discharge and was no longer legally responsible for the U.S. Bank debt.  Since Debtor has carried his burden of proving Defendant knew of his discharge, the Court must decide whether any willful violation of the discharge occurred.

     Defendant first argues that if any violation occurred, it was merely a technical violation which does not warrant sanctions.  In her post-trial brief, Defendant cites many cases which she

believes should be the standard for creditor misconduct.  Defendant's Post-Trial Brief, pp. 9-10.  The Court agrees that the actions described in the cases cited by Defendant were egregious and vexatious and warranted sanctions; but egregious and vexatious conduct is not the standard.  The court does not need to find a bad motive or harmful intent, the court need only find that the "creditor or entity had knowledge of the discharge and willfully violated it by continuing with the activity complained of."  In re Waswick, 212 B.R. at 352.  Moreover, Defendant's actions were not mere technical violations of the stay, but instead demonstrated an ongoing pattern of conduct with the ultimate goal of having Debtor repay a discharged debt.  Debtor testified that Defendant contacted him for the first time regarding the U.S. Bank debt only a few months after his discharge.  At that time, Plaintiff told Defendant that this debt had been discharged.  Had Defendant stopped at this time the Court would be inclined to agree that a mere technical violation occurred.  This call, however, was followed by one or two calls per year for five years.  In addition, and much more egregious, were the acts of Defendant's divorce counsel, Jensen.  Jensen sent multiple letters, first to Carol Johnson, Debtor's divorce attorney, and then directly to Debtor seeking repayment of the U.S. Bank debt.  Although Defendant argues these were not attempts to collect a debt, the Court, after reading the letters, disagrees.  In Exhibit No. 6, for example, a letter from Jensen to Johnson dated June 6, 2002, a full year after Debtor was granted a discharge, Jensen specifically mentions the discharged U.S. Bank debt as a debt that Debtor needs to resolve.  As an attorney, Jensen knows, or should have known, that debts discharged in bankruptcy cannot be collected.  Jensen also should have known that any attempt to collect such debt was a violation of the discharge injunction.  By seeking repayment of these discharged debts on Defendant's behalf, Jensen also committed civil contempt of a bankruptcy court order.

7

Next, Defendant argues that she never instructed Jensen to collect the debt from Debtor and that she should not be held responsible for the actions of her attorney. Even if Defendant did not ask Jensen to send the letters or authorize Jensen's acts, under the facts of this case, it can be inferred that she ratified those acts. See Stark v. Starr, 94 U.S. 477 (1876) (holding that client can be bound by actions of attorney upon ratification of those acts). A client is deemed to have ratified her attorney's acts by acquiescing to them over an extended period with full knowledge of the facts. Rolfstad v. Hanson, 221 N.W.2d 734, 735 (N.D. 1974). When a party stands by silently and lets her attorney act on her behalf, she will be estopped from denying the attorney's apparent authority to act. See In re Mehus, 278 N.W.2d 625, 630 (N.D. 1979) (holding that in most instances, silence is evidence of intent to ratify). For over five years, Defendant was told by Debtor that his debts had been discharged in bankruptcy. She was told that he was receiving letters from Jensen regarding those debts, and she was being copied on those letters. While she may not have told Jensen to send the letters, she stood by silently with full knowledge they were being sent. To now say that she did not ask her attorney to send the letters and that she did not know what her attorney was doing is disingenuous.

Based upon Defendant's knowledge of Debtor's bankruptcy discharge, the multiple phone calls made to Debtor, and the actions of Jensen in sending letters to Debtor's divorce attorney and ultimately, directly to him, the Court finds that Defendant knowingly and willfully sought the repayment of a debt after discharge in violation of the discharge injunction as set forth in 11 U.S.C. § 524(a)(2). Based upon this finding the Court is left to determine the amount of damages suffered by Debtor.

8

In his post-trial brief Debtor seeks $7,500.00 in attorney's fees and $5,000.00 in emotional distress damages. Unlike section 362, section 524 does not prescribe what damages courts should award for a violation of the discharge injunction. United States v. Torres (In re Torres), 309 B.R. 643, 647 (B.A.P. 1st Cir. 2004). Courts therefore have relied upon section 105, which allows courts to issue orders necessary or appropriate to carry out the provisions of the Code. Id. Willful violations of the discharge injunction are punishable by contempt. See Gakinya v. Columbia College (In re Gakinya), 364 B.R. 366, 370 (Bankr. W.D. Mo. 2007); In re Goodfellow, 298 B.R. 358, 361 (Bankr. N.D. Iowa 2003). A creditor found in contempt for violating the discharge injunction is subject to actual damages, including attorney fees. In re Gakinya, 364 B.R. at 370; In re Goodfellow, 298 B.R. at 362. Because Defendant had knowledge of Debtor's discharge in bankruptcy and willfully attempted to collect a discharged debt, the Court finds Defendant to be in civil contempt of its February 15, 2001 Order discharging Debtor pursuant to 11 U.S.C. § 727. Therefore, Debtor shall be awarded attorney fee's in the amount of $7,500.00 and costs in the amount of $250.00. Debtor, however, is not entitled to damages for emotional distress. Within the Eighth Circuit, a finding of civil contempt is not the appropriate vehicle for awarding emotional distress damages. McBride v. Coleman, 955 F.2d 571, 577 (8th Cir. 1992) (holding that awarding emotional distress damages are troublesome in ordinary tort cases and should not be imported into civil contempt proceedings). Even if, however, emotional distress damages were available, the Court received inadequate evidence to conclude that Debtor suffered any emotional damages, and the claimed damages of $5,000.00 appears to be an arbitrary amount.

Based upon the foregoing, it is the ruling of the Court that:

9

1) Debtor's discharge includes all debts assigned to him as part of the parties divorce decree entered into on November 9, 1999, in Polk County, Minnesota;

2) Defendant, Jeannine Faye Erickson is in civil contempt of court for violating this Court's Order of February 15, 2001;

3) Defendant is prohibited from contacting Debtor in the future regarding the payment of any debts discharged in bankruptcy; and

4) Debtor is awarded attorney fees in the amount of $7,500.00 and costs in the amount of $250.00.

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated this 8th Day of January, 2008.

**WILLIAM A. HILL, JUDGE**
**U.S. BANKRUPTCY COURT**